University v. Wisconsin Alumni Deanne Maynard on behalf of Washington University I'd like to reserve three minutes for rebuttal if I may. The judgment should be reversed and the case remanded for further proceedings. For this six year period preceding the parties tolling agreement, the claims are timely for two independent reasons. First, under the well settled periodic payments doctrine, each underpayment was itself a breach. That only applies if the breach did not go to the essence of the contract, in which case it's a single breach, is that right? No, your honor, that's not correct. And that's the error that the district court made. So the district court relied on a case called Siegel, which is a Wisconsin case that is not a periodic payments case. The Wisconsin court has made clear, since Siegel, in the Jensen case, that the total breach theory does not apply to periodic payments cases. And that for all contracts where payments are due in installments periodically, as in this case, the claims are themselves any breach of the contractual duty is itself a separate breach. Every breach triggers a new statute of limitations. Exactly. That's correct, your honor. And so at least for the period six years preceding the parties tolling agreement, which goes back even beyond that date for the royalties previous to that, those claims are timely under Wisconsin law being back a hundred years. And it's accepted doctrine in most jurisdictions. And this court's recognized that in the MCI case. It's very settled doctrine. It goes back to Butler. It goes all the way back to Butler. Your arguing should show that all of your arguments, the equitable estoppel or the continuing breach theory, is the position that they had a continuing congregation to reassess the fair value of the 15 patents. Is that right? No, your honor. That's a separate argument for why. I don't know about anything. Is that what you're telling me? I'm wrong about everything? No, your honor. I'm wrong about everything. So which one of those two things am I right about? I'm going to try to answer your question, your honor. There are two separate reasons why. Can I answer it today? Yes, sir. Hopefully in the next 30 seconds. There are two separate reasons why the claims dating back six years before the tolling agreement are timely. One is the periodic payments doctrine. Each payment itself was a separate breach. It was an underpayment. It was too low. Let me ask you this one. Let me ask you this one. What was their obligation arising out of that 1993 agreement? What were they obligated to do insofar as valuing the patent is concerned? They were obligated under section 3A3 of the agreement to set a value for the co-owned patent that was a fair value. This is what the district court held. A fair value as of when? A fair value at least in that case. We also believe there was an obligation under that agreement upon significant events to reassess whether the valuation was correct. And that obligation arises from what? What language in the contract? That separate obligation arises directly under 3A3, which requires that the calculation of the income that Wharfe is supposed to share with Wash U be fair and a relative value as compared to the other licensed patents. As of when? As of 1998? As of 2001? During the life of the agreement? As of when is it supposed to be fairly valued? Definitely initially in 1998 it had to be a fair value. Do they have to recalculate it every year? Not every year, Your Honor. But under upon significant events that would make clear the value is wrong, they would have to recalculate it. Under their views there were significant events, yes, including the Orange Book, that's right. In 2000, there were multiple significant events within the six year period, Your Honor, that triggered a duty to reassess the valuation. One is the one you mentioned, the listing in the Orange Book. One is in 2008 when Wharfe internally recognizes, renews its determination that the patent, this patent, the co-owned patent, directly covers the Zimplar product. Wharfe also joined Abbott in asserting this co-owned patent against eight generic companies to block competition. In four of those cases... And when was that? That was in 2012, Your Honor. And then in 2012 and 2013, the other two solely Wharfe-owned patents that directly covers Zimplar expired. And this was the only patent remaining. So at that point it became incredibly valuable? I beg your pardon? At that point it became incredibly valuable? It was incredibly valuable all along, Judge McKeon. Well, what am I surprised that you say that? But doesn't that, the more you talk about 1998, doesn't that make Judge Sleet's reasoning more and more accurate even if we consider what you call the installment payment doctrine or the periodic payment doctrine? Because at some point, if the flawed decision, whether it was flawed in good faith or it was flawed because your client was taken advantage of, if all of that happened in 1998 and there's not an automatic obligation to recalculate it each year when a periodic payment is made, does the installment payment doctrine really apply? Because isn't there some view that the 1998 decision becomes settled six years after that because that's the reason there's a six-year statute of limitations? No, Judge Hornick. It's quite clear under Wisconsin law that the periodic payment doctrine applies to periodic payments cases. Even when there's no duty to re-examine the calculation of that periodic payment because that's what you just said. You said there's no standing obligation each time a payment's made to recalculate. It's only if there's a significant event, whether it's the Orange Book or something else. So there really is no statute of limitations. There is a statute of limitations under the periodic payments doctrine and it dates back six years from the time you sue or hear the tolling agreement. And Butler's a perfect example of that, Judge Hornick. So Butler's a Wisconsin Supreme Court case. The employee in Butler claimed that years ago. But in Butler there was a specific time at which a payment was made and it was very clear from the very beginning what the amount of that payment was and it was clear to the subsequent payments were less than the amount was paid for. That's right. But under the question Judge Hornick asked me, Judge McKee, if Judge Hornick's theory were correct, all of those claims would have been barred because the erroneous calculation was set more than 12 years before the suit. Yet Wisconsin allowed the employee to recover the eight-year difference for the six years before the suit. Newnan is another example. Newnan is a Wisconsin Court of Appeals case. There the erroneous calculation, the methodology was changed more than 15 years before the suit. It was a annuity payments case. Yet the Wisconsin Court of Appeals held that the claims were timely for the six years before the suit. So no, Judge Hornick, it does not matter even if the event that makes the subsequent payments too low, even if that event occurred more than six years before the suit, under the periodic payment doctrine of Wisconsin, the plaintiff can recover at least for the six years. Absolutely. Two things. One thing I just now thought of, I just more than thought of. Do you know whether Wisconsin has a certification statute or a certification rule with Wisconsin Supreme Court? I don't know, Judge McKee, but there's no need to certify this. The law in Wisconsin about the periodic payments case is very clear. Well, according to them it's not so clear because they disagree with your reading. I mentioned they disagree with your reading of Butler. They disagree with whether or not Butler applies in this context. The only cases that the district court relied on, and really the only two cases that the other side has, are inapplicable. One is Siegel, which is a continuous tort case. It's a, you know, it's not a periodic payments case. It's a case about a non-compete agreement. Well, if they don't want to answer, let me just try to go back to the second part of my question. Can you hand on your answer to Judge Hornak's question? If I'm correct, you said that there was not an obligation to regularly reassess the value at any set time interval, only upon the onset of certain events, and those events are not specified in the agreement. Is that right? The events are not specified in the agreement, but two points about that. The agreement does not allow them to set a non-relative value. It requires them to calculate the income based on a comparison between the value of the co-owned patent and the value of the other patents, and it expressly requires them to license the patent for the mutual benefit of both parties, and under their theory, Judge McKee, all the other patents could be held enforceable and invalid, and yet they wouldn't have to revalue. Even their expert conceded that upon certain events they would have to revalue, like if someone were to challenge the event. So it's, there's nothing in the agreement that forbids revaluation, and the agreement requires a fair relative value, which is what the district were held, and they have not challenged. But that changes over time. That's the problem here. If the fair value was fixed, it might still be a problem, but it would be dollars and cents. It wouldn't be the kind of money we're talking about now. The problem here is that the fair value changed. It changed drastically, I guess in, was it 2014, that the other patents that were supporting Zemplar expired? In 2012 and 2013, I believe. It was a gigantic change. You're saying even before then, there was a change in the value. The orange book was a change, and there's some other changes I think that I read before the orange book. Well, these are merits questions that you're asking, Judge McKee. Right now, what we're claiming is that at least for the six years before the tolling agreement, our claims are timely for ten different reasons. That's the nature of the contract. The merits question, we're trying to get to what were they obligated to do under the terms of the contract, because in my mind, that goes to the continuing duty that you're saying they had to reassess the value of the patent. Well, I will answer that, but I want to make clear that there are two separate reasons why the six years are timely. One is the periodic payments doctrine applies here, and that's true regardless of whether you think they had any obligation to reassess the value. Secondly, because significant events occurred within that six-year period that we believe required them to reset the value, reassess the value, and that's enough to survive. Is that under the principle of good faith and fair dealing, or some language in the contract? Both, Your Honor. So if I could point you to the length. First, the district court held under the good faith and fair dealing principle, and this is at A21, that works required to exercise its authority to assign relative values fairly and in good faith. They have not appealed that, and that is the law of this contract. In 3A3, it expressly requires WRF to apportion the income, quote, in accordance with, and I'm sort of eliding out language to highlight the best part, in accordance with such relative values assigned to patent rights in proportion to the total value represented by all patent rights included within such licenses. And so if they're going to pay the fair value to WashU each year of the income that WashU is entitled to, upon significant events that would call into question that their low valuation of this patent was obviously incorrect. But the logical extension of what you've told me the law of Wisconsin is on periodic and installment payments is the accuracy or legitimacy of the amount of each payment is back up on the table every year, and for six years back from each of those payments. Our claims as to six years back are timely under the periodic payments doctrine, whether you think... The payments don't change every year. They're tethered to significant events, correct? The recalculation of the payments is not tethered, it's tethered to significant events. In our view, your honor, the duty to reassess the value is tethered to significant events. And that's from 3.83, that's where you're getting that? From 3.83, from the combination of 3.83 and the provision in 2B2 at A295 that required WRF to license the co-owned patent to the mutual benefit of both parties. And to the extent WRF realized that it was grossly overvaluing its own patents and grossly undervaluing WashU's patents to WRF's benefit at WashU's expense, that's what we allege is a breach. And we allege that... And whether you think that's right or not, whether they're going to win on the merits is not the question. The question for the party now is whether the claims back six years are timely. And they are for two separate reasons. Whether you thought there was any duty to revalue or not, because the initial assessment, if that was the only assessment, then under Wisconsin law, still the claims back six years are timely. And as we believe, we have not... We've made a claim that they had an obligation to reassess the value of... It's really simple. Probably wrong here. There's such a simple drafting solution here, which is draft in a particular obligation to revalue, reassess the value of the patent at a certain date. And if the event... If upon that reassessment, they determine that prior valuation was inappropriate, to make a prorated adjustment for the next payment and just spill it out. And why isn't it that what you're doing, what you're asking us to do, you're asking us to put in that language in the contract and to initially amend the contract by inserting that kind of a clause? Because the concept of the income and measuring the income and the worth of this patent as compared to the other patent already encompasses that concept. 3A.3 does not allow WORF the power to set a non-relative value. And our expert testified that in the industry, one would expect in this kind of contract to reassess the value upon the triggering of significant events. And as I said, WORF's expert acknowledged that with respect to... There were certain significance. And in fact, they did revalue. They did... Upon a significant event, they rejiggered their own patents calculation in it. And apparently not the Wash U one. So it's... Rejiggered their own. What they say about it is that they did it to prevent some of the owners, some of the inventors from getting double counting. But the point is they did revalue. It wasn't set in stone. And so at this stage, we should be entitled to go back to the court and try to prove our claims on the merits. And I see I'm out of time. But if I could please address our Equal Estoppel claim. Go ahead. Thank you very much. Because that would... We put it forth more than enough evidence to survive summary judgment that WORF should be a stop from asserting... What is the Equal Estoppel arguments? The... What is the... What are the facts that would make you reliance upon their reasoning? Put it to you that way. May I tell you the affirmative misstatements first? Sure. Sure. Because they... WORF made affirmative false statements to WashU during the period that the distrovert concluded was the six-year period. Starting in 1998, when they knew that WashU was trying to figure out how to assess its value as compared to the other patents in the portfolio. And it expressly... WashU requested the license, the Abbott license. And WORF replied, we can't give it to you because of confidentiality provisions. That's a quote in the email at A-171. We now know there are no such confidentiality provision in the license. WORF expert admits that in the record at A-1295 to 96. In 2001, also during the six years the district court found to be the first statute limitations period, WashU again was trying to figure out how to assess whether its relative value was accurate. And it asked WORF how it was calculating it. WORF sent a letter, which is in the record at A-1591 to 92, that contains multiple falsehoods. Multiple falsehoods. First, it states that WORF attributed the compound patents, that's what the letter says, the compound patents, that they are allocated 70% of the royalties. That is not true. There is only one compound patent. And there are only two patents that were treated in the 70% category, only one of which was a compound patent, meaning that it was for a composition. The other patent was a method of treatment patent, just like the co-owned patent. Was this information available to your client then? No, Your Honor. Well, the letter, but not the proof that it's false. What efforts did they take to look behind the letter? Did they make any effort at all to look behind the letter, or they just accept these representations as true? And does that make a difference? They accepted the representations as true, as they were entitled to under the agreement. It may have been entitled to do it, but that is a reasonable question. Given the nature of the industry, was it reasonable for them to do that? Yes, Your Honor. These are two academic institutions engaged in research, and they had worked together to co-develop a patent. Wash U, under the agreement, was paying WORF 15% administrative fee to license the patent to the mutual benefit of both parties, and there was an express obligation in the contract that WORF cooperate with Wash U. Yes, Wash U should. The alternative rule is really unsavory. The alternative rule, and what they're really saying is, Wash U should have believed that this other academic institution was lying to it about both the confidentiality of the license, and about the way that they had calculated the royalties, and should have sued them at that point. Could another way of saying that would be that it's incumbent on Wash U to do their due diligence? There was no way without the license to figure out what else was licensed within the license, and WORF's expert admits that. You're saying your client was not obligated to say, prove it. When WORF says, we can't tell you because of confidentiality provision, you're saying your client had no obligation for these relationship reasons to say, prove it. That's right. Not just for relationship reasons, Judge Hornac, but because the agreement entitled them to rely on WORF. Wash U was paying WORF 15% to license the patent for the mutual benefit of both parties, and that entitled Wash U, as the junior party in the agreement, to rely on WORF being there and dealing with it. Certainly, I read it. Assuming even that the confidentiality explanation was legit, whether it was or it wasn't, I don't remember. Assuming that it was, you certainly could have, your client certainly could have asked them to attempt to get permission from Abbott's with whatever protection they needed to have built into that protection, but allow them to get Abbott's to disclose that to you. My guess is that's been all the time. There's a confidentiality agreement between two parties. There's a third party who's interested in the terms of that confidentiality agreement, and the third party says, look, go to your co-contractor and get their permission to disclose this to us, and they'll give whatever protections they want in terms of any further disclosure, but get them to release this. You could argue that that degree of due diligence, if you will, may not be required, may not be reasonable. That, in fact, would be unreasonable given the nature of the institutions, but why not do that? Three points around our response to that. One, this discussion we're having here is all about disputed facts. All we're seeking now is to go back and have our day in court. I don't need to hear the answer. I would like to give you, may I please give you the answers? Well, you guys have been on for quite a while. I don't really, because it is an issue of summary judgment, and it is whether or not it's a disputed fact. How do you answer the question? So you can run the risk of dedicating from the answer you just gave me, which seemed to be unworthy of time, which is what lawyers usually do. They score a point, and then they take away from it by insisting on saying more. You're welcome to do that if you want, but you don't really need to. I would beg the court for a minute of rebuttal, if I may. I know I've used way more than my time. Well, you did have rebuttal, didn't you say? I had asked for three minutes of rebuttal. Okay, so you've got one out of your three minutes you can use. Thank you very much. Good morning, Your Honors. Rob Schaeff on behalf of WARF. May I please the court? With the court's indulgence, I'd like to start with what I think is on everyone's mind, and that is whether or not the periodic payment doctrine applies in this case. And our submission is that it does not apply for three reasons. First, and the court can dispose of this issue in the first instance, because Judge Sleet, who not only presided over this case up until the pretrial submissions, but also over the Zemplar-Hatch-Waxman litigations for more than six years, correctly determined that this is a total breach case when the Washington University's allegations trace back to the only time in which WARF was obligated to set a relative value to the joint patent. Assuming you're right, I just asked Ms. Maynard about that, and she said that even if you accept that it's a total breach case, that wouldn't preclude the doctrine from applying. And maybe you are, but I think that's what you told me. I don't think the Washington University disputes this in their brief that Seagal applies. If it's a total breach case, if it's a material performance in the first instance, then the periodic payment does not apply. That's very clear. That's in Seagal. I think they attempt to distinguish Seagal in the facts, in that it's not a non-payment performance obligation. But, Your Honor, certainly this is a total breach case. So your theory of why Judge Sleet's correct boils down to if you got it wrong, and your worthy adversary says you culpably got it wrong, and your client culpably got it wrong in 1998, as long as you hold your breath for six years and a day, you can continue to make contractually inappropriately low payments forever. Well, Your Honor, I'd like to address that because... Answer the question first. Yes. No. In the first instance, I don't think it was contractually low, but yes... But that's a fact question. But that is a fact question. Excuse me, Your Honor. Yes, that's correct, that the relative value was set at 0.97% when it was originally licensed as part of a much larger portfolio of Rorf Soleon patents to Abbott in 1998. And there was good reason for that original setting of that 0.97% relative value, even though they may argue that it was unfairly low at this point. And that's why we have trials. And that's why we have trials. But I don't think it's in dispute. The only evidence that they can point to that's in dispute is what their experts say. And expert testimony based on customary practice, when the terms of the interinstitutional agreement in this case are clear. And to follow up on your point, Your Honor, there is no written obligation, there's no express obligation for Rorf at any point in time to revisit the relative value that it set in the first instance. Let me put an end to that, because you're saying the obligation, the implied obligation of good faith does not require you to periodically reassess the value of the patent? No, it's a little bit different than that, Your Honor. The implied covenant of good faith and fair dealing certainly cannot rewrite the terms that are expressed in the agreement. And we address that in summary judgment. If it turns out that your client got away with it in 1998 and they successfully held their breath for six years and a day, top of the line. I think that's right. I don't think that's a fair characterization of the facts. But that's what they allege. That's what they allege. And we haven't had a trial, so we don't know what the real facts are, what they say they think they can prove. If it turns out that that's what they can prove, you're going to ask for a judgment in your favor, because you're going to say, yeah, that's the way the cookie crumbles. The statute of limitations applies. And Judge Sweet correctly determined that there was a total, a material failure, alleged material failure. So you didn't get a license to make 20 more incorrect payments because they didn't do something within six years of 1998? Well, I don't think that's exactly correct, Your Honor, because again, there's no express requirement for revisitation. And there's good reason for that. And it's not hypothetical and it's not anecdotal. They explained to the Washington University from the very first instance, and I'm at pages 1,004 and 1,005 of the record, in which they explained that because it was very difficult to determine whether a given patent at a given point in time was used by a licensee, that they needed flexibility in assigning the relative value. But if you're weighing on the law, your answer to my question should be a bold, vigorous, affirmative, you got it, Judge. That's exactly what can happen. That is exactly right, Your Honor. And so is Ms. Maynard wrong when she says there was an obligation to revisit the value of these contracts given significant events? She is wrong, Your Honor, and here's why. They were given an opportunity to negotiate the terms of this agreement. And during the negotiation and formation of the terms of this agreement, to follow up on Judge McKee's point, they did negotiate for the right to use the patent for noncommercial purposes. They negotiated the right to use it for teaching and for research. But all of the commercial purposes were granted to Wharf. And at that point in time, what did they not do? They did not ask Wharf for any reason, whether it be a milestone based on some threshold of royalties based on the sale of Zempla or some significant event, whatever that is. They did not ask for Wharf to write that into the terms of the agreement. There's nothing expressed in the IIA whatsoever that says the Wharf has to go back and revisit. And there's good reason. Well, it seems that's true. But what about the obligation for good faith? Can you give me an example? Let's assume that the same two parties entered an agreement for some sort of glue. There's a chemist at the university who's working on a formula that he thinks is going to be the be-all and the end-all of glue. This is going to make super glue look like egg whites. It's going to be so strong. It's going to treat the piece as welding. So they entered into this agreement, and you are asked to value this glue. And you have people that use the glue, and it doesn't work. There's a temporary and very transient temporary bond, and two pieces of paper don't stick together. So you value it at very, very low. And six months later, and that's when you start making payments to the authorities based upon the fact that you lifted this glue, and two pieces of paper don't stick together very tightly. Six months later, someone comes in and goes, gee, you know that glue that we found? We can put it in these little yellow things. We can call them Post-its, and you can make a fortune. So at that point, you know the value of that glue is substantial. You're saying at that point there's no obligation to go back and say, and this is actually what happened with the glue and Post-its. There's no value, no obligation to go back and say, you know, we thought your glue wasn't worth anything because it did not create a permanent bond between two pieces of paper. But now we realize there's a very important commercial value to not having a permanent bond between two pieces of paper. And we're going to reassess your patent. You're saying they don't have to do that. They can just go ahead assuming that that patent is worthless and sell Post-its and not compensate them for it. Your Honor, it may seem like a harsh result, but when you have to take into account that Wolf was responsible to 26 other inventors who also shared in the royalties of the sale of Zemplar. Well, what does the obligation to 26 inventors have to do with your obligations to them under your contract with them? Well, again, there's no reason to revisit the relative value, and for good reason, because changing the relative value as to their one patent will necessarily adversely affect the relative value as to other patents, maybe many other patents in your portfolio as a whole. We're talking about a relative value has to equal up to 100%. And they made this very clear to them from the get-go that they needed flexibility in assigning a relative value under 3A, little Roman numeral 3 from the very beginning. They followed up on that concept, and they said, what do we do? We apply a blended rate to the overall payout for each of the patents in the portfolio. So the contractual principle is one and done. Correct. That is correct, Your Honor. That's what the deal of the parties was as a matter of law. As a matter of law, and you know what? It played out exactly like that, Your Honor, because it is undisputed from 1998 until 2011 Abbott did not use the joint patent. It's undisputed that Abbott did not list the joint patent in the Orange Book until 2011. And what did Wolf do? Did they skip payments? Did they miss payments? Did they say, we're not going to pay you because Abbott's not using the patent? Not at all, Your Honor. They continued to make the payments they were contractually obligated to make under the terms of the II and the 0.97% relative value that they set in 1998. And the Washington University accepted those payments and endorsed those checks. So you made a terrific down payment on a jackpot. That's right. And you're saying that's, as a matter of law, that was the deal with the parties. That was the deal with the parties. And now they're trying to come back, in hindsight being 2020, but they point to the Orange Book. They talk, they speak to all these litigation activities. Again, those were expressed within the terms of the contract. I refer you, Your Honor, to Section 9 of the IIA. That's at A-50 and 51. Washington University had absolutely no rights to do anything with respect to the litigation. Why wouldn't there be a fact question? Many of the parties, the intended parties to the contract, why would that be such a judgment? Well, it's a legal question that I believe that Judge Sleet determined, Your Honor. And more importantly, it's outside the limitations period. If we want to look at what's inside the limitations. Well, that gets us to equitable estoppel. And why wouldn't, one, the occurrence of the facts be a disputed fact, as she represented them? Whether or not there was a reliance, why wouldn't that be a disputed fact? And whether or not the reliance was reasonable. Why wouldn't all those things be disputes of fact? Well, if we're talking about equitable estoppel, it's outside the limitations period. Judge Sleet correctly found, and you viewed it in light most favorable to them. There's no factual record to build here, except for some expert testimony who's only going to talk about customary practice in the industry. There's no detrimental reliance. Is it admissible evidence? It's certainly admissible, Your Honor. But it doesn't shed any light on what happened. So you're saying it's admissible evidence that's not very good, or it's matter of law is not sufficient? I think it's the latter, Your Honor. I think it's admissible evidence, but I don't see how it's going to help the court in determining the meets and bounds and what was required under the IIA. When they asked you to see the Abbott license, you're saying that was outside of the period of limitations? The Abbott license, and I'd like to address the 1998 email, and this is at A171 in the record, Your Honor. There is absolutely, they argue in the reply brief at page 21 that they requested a license to determine whether or not the relative value is fair. That cannot be the case. First off, there's nothing in the email. Let me break that down. What cannot be the case? That he did not request it, or the reasons that he had for requesting it were not right? The reasons that they requested were not right. There's no mention at all in the email about relative value at all. And did they request to see the license? They, well, there was no license to request, Your Honor. The license was not executed until September of that year. This request came in May, and that's in the body of the email. And what did they request? They requested the license. There was nothing to give them. Then you respond, and you can't respond. We can't give you the license, whether or not one exists, because of company agility concerns with Abbott. Well, if I could turn your attention to what actually the email says, and my friends on the other side conveniently leave out the last sentence of the email where Ward tells, and they responded within the hour, Your Honor, so there's no concealment here. There's, there's, there's no... Well, wait a minute. Somebody responded within the hour does not mean there was a concealment. Understood, understood. Maybe concealment very frequently. Okay. What they said, Your Honor, was I would think that your office would have the same restrictions. Okay. That's not referring, and that was with respect to confidentiality. They said, quote, in the email in response back to Washington University, in terms of the confidentiality, I would think that your office would have the same restrictions. So there was no relative... Do trial judges call that a non-responsive answer? I don't think so, Your Honor. What about you, by your client in the email? Well, they say that there was no license agreement because it hadn't been drafted. There was no context with respect to relative value. The relative value hadn't been set, and wasn't going, and hadn't, and wasn't set until six months later in November. So the fact that they say that they're arguing that they requested it for terms of relative value simply can't be true. So they turn the information over in November? The relative value is not set until November. So at that point, did they, knowing that there's a request out there, did they turn it over? Um, at that... Well, there was no request for relative value here, Your Honor. There's nothing in the email that says anything about relative value. It just says, Dr. Naber would like to see any license or amendment that has been executed. So when was the license available? The license was not executed until September of 1998. And at that point, your client obviously turned it over knowing there was a request, right? Well, they did not turn it over due to their own confidentiality practice. But moreover, Your Honor, the fact is under the 2001 letter that she cites, and that's at 854 in the record, there's no question that, and Judge Sleet determined this, that there was nothing stopping the Washington University from filing suit at that point in time. They knew the relative value. They knew the number of patents in the portfolio. They knew who the licensing was to Abbott. They had received royalty checks for the past three years, and they could reverse-calculate to determine exactly how much. Can you explain that to me, Bill Hazel? What does reverse-calculate mean? Sure. Based on the terms in the IA that are explicit based on the revenue received, and to answer Your Honor's earlier question, the royalties were based not on some significant event, but based on the sales of the Zempar drug product. So they would take the total sales, and based on the 1993 agreement that carried over into the 1998 agreement, the royalty obligation was capped at 7% to Wharf. Wharf took those revenues, and per the agreement, they took out the 15% administration fee for the prosecution. They took out one-third. That was the agreement. Those are expressed in the IA. And they could take, based on that 0.97% royalty relative value, which they told them about in the 2000 letter, they could divide the amount of the royalty payments that they received to come up exactly with the amount of royalty that Wharf received. And Judge Lee correctly found that there was nothing for them to follow up to ask a question if it wasn't, again, for the license agreement. It certainly could be, Your Honor, for a list of the patents, because that's all they needed, and they admit that's all they needed to determine whether the relative value was fair, or the patent numbers, or they could have questioned the policies and how they came up with the 70-30 split. They didn't follow up at all. And they didn't follow up for 12 years. So you're saying, yeah, the relative value was wrong, but they could have found that out back then, and they really didn't do the kinds of things one would expect of them to find out that was screwing them? Is that what you're arguing? Well, Your Honor, they were told expressly what the relative value was, and it was 0.97%. And we have to view this, not as myopically as they are, but the fact that there was 31 other licensed patents that provided value to the overall exemplar product. And that was all explained to them, Your Honor. Didn't there come a time where it became clear to someone outside of the issue that the relative value that they'd been relying upon and accepting was devalued, that it was wrong? No, Your Honor, because I respectfully— No, Your Honor, when it was the only patent supporting exemplar. It started being changed at that point. When it was the only, after the expiration of the compound patent in 2014? Right. I can see, Your Honor, the value of the patent change. But that's the purpose, but not the relative value, necessarily. I'm beginning to feel this weird frustration. I've got a lot of problems with these three answers. How could the relative value not change if it's the only one out there? Are you telling me the relative value doesn't change? Well, the relative value as to all the other patents, there were still some in existence— But fewer. But in view, Your Honor, of the fact that the compound patent dominated all the other patents in the portfolio all the way up until 2014, that it's a blended theory that's paid out throughout all of time. And even though the patent wasn't being used, they were still getting paid on it. They say it wasn't fair, but that discounts the fact that they were getting paid on it for more than a dozen years. That's the deal. That's not— That doesn't matter. That's the deal. They're getting paid on it. Okay, you agree to that. The issue is whether or not they're taking time when they're being paid unfairly. So you're saying, well, if you're getting paid on it all these years and it was a worthless patent, so what's the big deal? So finally, it became worth some money. Okay, we didn't change the value, but if we're getting money for use that maybe you shouldn't have gotten, is that something that's kind of what you're getting all this money all these years, the patent was worthless, because of time when it's no longer worthless, that's the deal you made. That was the deal that was made from the very beginning, and they knew that was the deal, Your Honor. That was explained to them. That's exactly what judges need to determine. The deal that if they made, if there came a time when the value of the patent changed, then they somehow were fairly compensated for the patent. That's what I understand the deal to be. I'm just saying there's no obligation to reassess the value. There absolutely is no obligation on behalf of WAR II to revisit, reallocate, and reset the value at any point. Even under the doctrine of good faith and fair dealing. That would require rewriting the contract, and that's correct, Your Honor. But it's implicit. It's not, because it's not expressly... It's not the implying doctrine of good faith? It's not the implying doctrine of good faith? I refer, Your Honor, to the Supervalue case in that the implied covenant of good faith and fair dealing cannot provide an independent source of obligations from which a court may draw to reform agreements, because they appear with the benefit of hindsight to be inequitable... Okay, but the key language there is to reform the agreement. That's correct. If going into this, this was basically within the realm of the expectation of both parties, you're not reforming the agreement, you're refining the agreement. You're putting gloss on what the parties of the agreement intended, and then it seems to me we're back into a question of fact, and that's not summary judgment. I respectfully disagree, Your Honor, because it does take... Go ahead, because if you're... It does take a rewriting of the terms of the contract to require an obligation on warp to revisit for any reason. They say some significant event. That's unworkable, and I don't know what that means. Here, the ointment book is a significant event, isn't it? Well, it was a significant event in 1998. You're saying it's unworkable. Is it a significant event? Under Hatch-Waxman, yes, it's a significant event in terms of litigation. In the other patent supporting sunflower expiring, that would seem to me to be extraordinarily a significant event. Your Honor, if I could go to your first point, because I just... We can answer this question, yes, in our first, and then go back to the beginning time if you want to, but answer this question. It's not an extraordinary event in view of the way in which the agreement was originally structured. But then we get back to the meaning of the agreement. I'm just trying to keep this simple. I'm getting a question answered. I'm not going to have a lot of time to do that. The other patent supporting sunflower expiring, so the only patent supporting this drug, which as I understand it is of incredible value in the area of kidney transplants and kidney disease. So the one patent supporting that, and all of a sudden is of no greater value than it was three or four years earlier when a lot of patents were supporting sunflower. No, no, and I'm willing to acknowledge that, of course, the value is greater. But the point here is that the litigation activities, and certainly the orange book listing, is contemplated in the original bargain for exchange between the parties. Because it's written there, or because that's the course of dealings of the parties and a reasonable understanding of parties and their shoes? It's written into the agreement. And it's very important to note that all commercial rights were granted to Wharf in Section 9 of the IIA, and I'm at pages 49 and 50 of the record, Your Honor. It's clear, I'm sorry, 50 and 51, under Section 9, entitled Legal Actions, that Wharf had the sole authority to carry out legal actions, including listing of the patents in the orange book, which is Abbott's. And Abbott's responsibility is the argument. But they didn't have the authority to do it. They said the argument is when you did it, it changed the value of the patent that you were obligated to compensate them for. And whether it changed the overall value of the patent, I don't disagree. At some point in time, the 815 patent became more valuable. But throughout the term of this agreement, and this is rare error, Your Honor, for these types of agreements, the Washington University, for doing nothing but sitting back and collecting royalty checks, throughout the term of the agreement, when Wharf was responsible for prosecuting the patent, getting the patent issued. Well, I like the argument about, well, you got money you didn't deserve all these other years. Tough darts. You didn't get the money you needed. I think this was all correctly determined by Judge Sleet in the first instance. But your argument then boils down to, and if I'm right, it's OK. You can say it. The deal's a deal. Yes, Your Honor. The deal's a deal. And the deal was 1998, and it was frozen in amber. And there could be significant changes, vast tectonic shifts in the market for the drugs. It doesn't matter. Deal's a deal. That's exactly right, Your Honor. And I would love to have the crystal ball that the WashU pretends to have now. I'm sorry for my informality. But this is exactly... I started it, so go ahead. This is exactly what Worf was telling the Washington University from the very beginning, Your Honor, is we don't know how these patents are going to be used. And that's exactly how it played out. So this isn't some instance other than a turning argument in hindsight 2020 saying, hey, the value of the patent changed at some point in time. Yes, you're right. It did. But this was contemplated by the express terms in the IIA. A deal is a deal. And we've been paying you all along, whether the patent is being used or whether the patent wasn't being used. They've probably gotten past this. Maybe we haven't. Are you now saying that under the contract, the deal was to set a value in 1998. It's X dollars. And that's what you're going to get paid for the patent no matter what happens to the patent in the marketplace, no matter how valuable it may become, you're getting X dollars because you jumped into that bet in 1998 and you're not getting out of it. Is that what you're now arguing? Almost, Your Honor. The relative value of 0.97% was set. The amount of money that they make is based on the sales of Zemplar. But yes, they made a deal. They made a deal. They'd get a third of that. And the administrative fees were deducted from that. They entered into this agreement. That's exactly right. The 0.97% was negotiated for. There was no milestone payments. At some point, you had agreed that there was an obligation to reassess the value. And then we got to speak upon certain events. But I thought you had agreed that at some point it became clear that the value of the patent was greater than had been agreed to in the conversation for that. But am I wrong about that? You are slightly wrong. I agree with Your Honor's question that the value became more patent. I mean, the patent became more valuable. There was no requirement for WARF to ever revisit that relative value based on any significant event. They argue significant event. They argue orange book listing. There is nothing within the four corners of the IIA that ever required revisitation. Okay. At least for things that were done. You're saying the implied covenant of good faith does not extend that far because then you're rewriting the militarities. That's exactly right, Your Honor. It took a while. Okay. And I'm sorry it took a while. If I could just touch upon briefly, I mentioned the one with respect to equitable estoppel. Judge Sleek properly determined the light most favorable to the Washington all these. He found no concealment. He found no detrimental reliance. Certainly in 2001, he determined that they could have asked the questions, the same questions that they're asking now when we see the patents determine whether we think today it's fair. If you're right, then what Greg Sleek found on equitable estoppel wouldn't matter because he's saying there's been no breach. So if you're right, why would he even have acquired into equitable estoppel? That makes me kind of wonder about whether or not what you're saying is what Greg Sleek found. We're talking about maybe two different things, acts that happened within the limitation periods and acts that happened after. But you're saying it doesn't matter because the deal was you get X dollars period. Right. So why get into equitable estoppel? The deal was you're going to get paid X dollars for your patent. Right. They argued equitable estoppel that somehow we concealed something, somehow we misrepresented something. That certainly wasn't the case and certainly nothing that they couldn't have inquired about or found out as of late of 2001 within the limitations period to find out. Certainly nothing to preclude them from filing a suit at that time. As a last point, this is not an underpayment case as my friends on the other side argue because there's no disputed question of fact that Wharf every year and has continued every year to pay exactly what they were required to pay. There was a dispute there when you said we're required to pay. Based on the relative value that was set in 1998 at .97 percent. They never miscalculated. They never missed a payment. They never skimmed off the top. None of those things happened. They've paid exactly what they were required to pay under the relative value that was set in 1998. The only time that they were required to set a relative value and that was upon the original licensing of the patent. That is not in dispute. Moreover, this case is unlike the pension cases which either in the first instance there was a required amount that was agreed to and then there was a subsequent underpayment where each of those payments were either unrelated or independent. This all traces back to the original allegations that Wharf says deprived them of the original contract and that is a material failure to assign a proper relative value in the first instance. That is a total breach case. The periodic payment doctrine does not apply in those cases. The Seagal case makes that clear. They're not able to distinguish that case. Okay, thank you. Ms. May, you reserve a few minutes. My hair is now on fire. What am I missing here? What the hell was this contract? Was it for X dollars per head and an item? Because I clearly got the feeling before today that that was not the contract at all and that's what you're arguing. No, your honor. You're right. The contract required Wharf to pay a fair relative value. Determined as of when and for how long? Determined initially in 1998 and that determination was incorrect based on what they knew and they hid affirmative information from us that would let us know. And what are the facts of record that would get past summary judgment to support what you just said? So on page A-1010 in the record, there is a letter from Wharf to Abbott in 1998 saying this patent, the co-owned patent, quote, directly covers Zimplar. Wharf knew, Wharf knew before it set the initial valuation of less than 1% that this patent covered Zimplar. Wharf then lied to Wash U in the 2001 letter where it pointed to explain how it had assigned the patents. It said that it had given the compound patent 70% when in fact only one of the patents was a compound patent and the other patent was a method of use patent just like the co-owned patent. Two, it said that it had a practice or policy of dividing 70% between the licensed patents and 30% between the ancillary patents and divide evenly between the ancillary patents. That is not true. And there is a Wharf internal memo at A-846-847 that explains it was one compound patent and one treatment patent. And in our expert report at 2100-01, it shows the same thing. It is also not true. There is a different distribution. They use different distributions in different cases to treat their own patents more favorably. They did not always divide equally. So your argument is you are entitled to go to a jury and demonstrate, prove what you just argued the letter at A-054 is that your client was lied to on material matters on April 4, 2001 when an accountant wrote them a letter and that if you can prove that, then the door is open. No statute of limitations can apply at all. That is correct, Judge Hornick. And secondly, we should be entitled to prove that that initial evaluation was wrong at that time. It was greatly devalued. There were only three patents in the portfolio. Let me ask this. If what I understand Mr. Schieffer's argument to be is correct, then we would never have any equitable, estoppel inquiry at all in the district court because it would not matter because the contract was for X dollars, that is what you got, and there is no need to get into equitable estoppel. Doesn't the very existence of the equitable estoppel inquiry suggest that at least Red Fleet saw that the contract, at least as you were arguing, that the contract was very different than my understanding that was as to Mr. Schieffer's interpretation of the contract? Terrible question because you don't know what my understanding of Mr. Schieffer's view of the contract is. It's a terrible question, but hopefully you somehow guessed what I was trying to ask you out of that mess. Yes, Judge McKee, and nowhere in the contract does it say it's for X dollars. It says... Well, I've got X dollars euphemistically. X dollars would be for the relative value, not a dollar sum. It does not say that. Okay. So on page 896, what it says is, WIRF shall have the authority to assign relative values and to determine the income. The relative value, though, has to be the relative value between the patent rights. So to measure the fair value... You're saying, contrary to your friend, that when it was assigned at .97 in 1998, WIRF's argument is one and done, embedded in amber, that's it under the contract. You're saying, no, no, no, no, no, that's not what the language of the contract says. Right, Your Honor. That setting at .9, less than 1%, that was a breach. That was a breach. And even if you think it's one and done, Judge Warnak, we definitely argue, we've argued throughout these briefs, see that it does not apply here. Your opponent says it's one and done. Do you concede it's one and done, or do you differ with him? No, we have two alternative arguments, Judge Warnak. One is, even if it was one and done... But my question was, was it one and done? He says that if you read the contract, there is one valuation date, and that is 1998, and it was set at .97, and the contract creates no duty to revisit the .97, no matter what happens in market valuations of the patent over time. Is he right or wrong that the contract anticipated one valuation? Now, you say it was incorrect, and you were snookered later on, and all of those other things. But Mr. Schaffer says the contract says you do it one time and one time only. It does not say that anywhere. And you can read through it and look for that. That provision is nowhere in it. It nowhere says there's only going to be one setting of the relative value. It nowhere says there's not going to be a need to reassess the relative value if it becomes clear, based on significant events, that the value of the co-owned patent compared to the other... Are you adding a term to the contract when you say it has to be re-evaluated if there's significant events? What are you relying on to say that's what should happen? I'm relying on 3A3, which says that the income that's attributed to the co-owned patent has to be a relative value as compared to the other rights licensed within the agreement. And if significant events change, what is a fair relative value? And the district court held they had an obligation to set a fair relative value. If the events changed, then it must be changed. What you just said, though, if the events change, that's what that is the gloss you're adding to your interpretation of 3.83. Is that right? Or is that written into 3.83? I don't have it in front of me. You won't find those words in 3A3, Your Honor. But the 3.83, the concept of 3.83 encompasses that, which is that the value that Worf attributes to income for the co-owned patent has to be a fair value, that's the district court held, relative to the other patents in the license. And as Your Honor speculated, if all the other patents are invalid or unenforceable, then that can't be a fair relative value. They can't count income that way. Every time another patent drops out of the package, the relative value changes of this patent. It certainly could. We have two arguments that are consistent. One is they knew more in 1998 when they set the initial value. They knew 0.97 was not a fair value. The only patent that's like the other patents in the license patent is our patent. And they put it with the other 30 patents and treated it as worth nothing. But they knew and they told Abbott at 10-10 in the record that it directly supported Zemplar. And under the periodic payments cases, you can't have a total breach. That's what Jensen says. Jensen's attorney was a complete repudiation. The employer said to Jensen, we are not paying your pension payments anymore ever. And that was more than six years before Jensen sued. Nevertheless, Wisconsin said there's no total breach theory in a periodic payments case and Jensen could recover for six years of his pensions from the time he sued. So even if you think that there's only, it was one and done. The one was wrong. They set a way too low value. And at least our six years are timely. Two, six years back are timely because two significant events happened in those six years. And three, they affirmatively made misstatements in the 2001 letter that aren't true. That was during the initial six years. And we should at least get a trial. But at least get a trial. You're arguing that there's a genuine issue of material fact as to whether or not they did make misstatements, whether or not you realize, whether or not they're not reasonable. All those things you're saying are issues of fact. Absolutely. And judge, if I could just say, you were saying, no, Worf did not send us the license once there was a license. And although he stands here today and says, well, we should have asked, we should have tried harder to get it. Once we learned the facts in 2012 about the generic lawsuits, we acted promptly. We initiated discussions with Worf. We asked for the license. There's a repeated correspondence in the record with that. That's at A1645 to 1707. Even with the promise of confidentiality, they refused to provide the license. We had to sue to get the license. I'm going to request that you reverse. Maybe a transcript of this. And if you can, if you want me to check with Ms. Gravitsky, did I say that correctly? Yeah. Okay. I was going to do that, but of course not. About the details of the transcript, you can expect to cross. But if you could also come up for a second. Listen, I'm going to publicly commend you, both of you, really, really fine lawyers. I don't think any of you have been here before. You used to perform really better. It's amazing. Really great lawyer. Okay. We're going to have a hearing. This may not end. Mr. Schaffer, thank you very much. Thank you.